**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

**ABDULQAYUM WARDAK**
334 South Broadway, Apt. 3
Lexington, Kentucky 40508

Civil Action No. _____

*Electronically Filed*

PLAINTIFF,

v.

**FRANKLIN EPLEY**
Detective, Lexington Police Department
Individually
SERVE: Lexington Police Department
            150 East Main Street
            Lexington, Kentucky 40507

**LEXINGTON-FAYETTE URBAN**
**COUNTY GOVERNMENT**
SERVE: Office of the Mayor
            200 East Main Street
            Lexington, Kentucky 40507

and

**JOHN AND JANE DOES 1–10**
Unknown officers, supervisors, and
employees of the Lexington Police
Department / Lexington-Fayette Urban
County Government, individually

DEFENDANTS.

** ** ** ** **

**COMPLAINT AND JURY DEMAND**

Comes the Plaintiff, Abdulqayum Wardak, by and through counsel, and for his

Complaint against the Defendants, Franklin Epley, the Lexington-Fayette Urban

County Government, and John and Jane Does 1–10, states as follows:

1

## I.    INTRODUCTION

1.    This is a civil-rights action under 42 U.S.C. § 1983 and Kentucky law arising from the arrest, jailing, and ten-month felony prosecution of an innocent man for a crime that his accuser's own evidence — evidence in the investigating detective's hands on the first day — proved he could not have committed.

2.    In the early morning of September 22, 2024, a woman identified herein as C.Q.[1] was assaulted by a man she believed to be her Lyft rideshare driver.  But Mr. Wardak — the driver the Lyft application had paired with C.Q.'s ride request — never picked her up.  He waited five minutes at the designated pickup location, cancelled the request as a "no-show" when she did not appear, accepted a different fare, and drove home.  Lyft's own records document every minute of it.

3.    Defendant Detective Franklin Epley photographed the screens of C.Q.'s phone on the afternoon of September 22, 2024.  Those screens told him two things at once: that the Lyft application identified "Abdulqayum" as the paired driver, and that the same application recorded that the ride was "cancelled by the driver," that no trip ever occurred, and that C.Q. was charged a no-show cancellation fee.

4.    Five days later, Detective Epley swore out a criminal complaint that told a magistrate the opposite.  His affidavit swore that C.Q. "had been picked up at 269 W. Main Street at 0319 hours" — a pickup that never happened — and recast the

---

[1] The complaining witness is identified by her initials to protect her privacy; her identity is known to the Defendants and to the parties to the underlying criminal proceeding.  Plaintiff does not allege that C.Q. fabricated her report of an assault. The claims in this action arise from the conduct of the law-enforcement investigation that followed her report.

documented no-show cancellation as the assailant's post-assault flight.  It fixed the time of the offense at 3:25 a.m., the very minute a Lyft notification in Detective Epley's possession showed Mr. Wardak still parked at the pickup location two miles from the scene, waiting for a rider who never came.

5.      On that affidavit Mr. Wardak was arrested at his home, jailed for seven days, and charged with sexual abuse and assault.  After Mr. Wardak's counsel handed the police and prosecution the driver-side Lyft records confirming the cancellation, Detective Epley appeared before the Fayette County grand jury as the sole witness listed on the resulting indictment, which added a directly-submitted charge of kidnapping — a Class B felony.  Not until March 14, 2025, nearly six months after the arrest, did Detective Epley serve a search warrant on Lyft; the certified records Lyft returned corroborated Mr. Wardak's account in every particular.  On July 21, 2025, the Commonwealth's motion to dismiss was sustained, ending the prosecution without a conviction.

6.      Mr. Wardak brings this action to redress the violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and under Kentucky law.

## II.  JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and pursuant to the common law of the Commonwealth of Kentucky.  This Court has jurisdiction under

28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the pendent state-law claims pursuant to 28 U.S.C. § 1367.

8.    Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this District and all of the events and omissions giving rise to the claims occurred in Fayette County, Kentucky, within this District and Division.

9.    Pursuant to LR 8.1, Plaintiff states that he resides in Fayette County, Kentucky; that Defendant LFUCG is located in Fayette County, Kentucky; and that a substantial part of the events and omissions giving rise to the claims occurred in Fayette County, Kentucky, which lies within the Lexington Docket of the Central Division jury division.  See LR 3.1(a)(2)(B), 3.2(a).

### III.  PARTIES

10.    Plaintiff Abdulqayum Wardak is and was at all relevant times a resident of Lexington, Fayette County, Kentucky.  Mr. Wardak is an Afghan national who was admitted to the United States as a refugee after assisting United States forces in Afghanistan, and who at all relevant times was lawfully employed, including as a driver on the Lyft rideshare platform.

11.    Defendant Franklin Epley (Badge/ID No. 56671) is and was at all relevant times a detective of the Lexington Police Department, the police division of the Lexington-Fayette Urban County Government, acting under color of state law and within the scope of his employment.  He is sued in his individual capacity.

4

12.     Defendant Lexington-Fayette Urban County Government ("LFUCG") is an urban county government organized under the laws of the Commonwealth of Kentucky.   LFUCG operates, funds, trains, supervises, and sets policy for the Lexington Police Department ("LPD").

13.     Defendants John and Jane Does 1–10 are officers, detectives, supervisors, and/or employees of LPD and/or LFUCG, whose identities are presently unknown to Plaintiff, who participated in, reviewed, approved, ratified, or failed to intervene in the conduct alleged herein, each acting under color of state law.  They are sued in their individual capacities, and Plaintiff will amend to identify them by name when their identities are ascertained.

## IV.  FACTUAL ALLEGATIONS

### A.  Mr. Wardak's Night as a Lyft Driver

14.     Throughout the night of September 21–22, 2024, Mr. Wardak worked as a Lyft driver in downtown Lexington, driving a white 2019 Toyota Camry bearing Kentucky plate B0Y058 — the only vehicle associated with his driver account. Between approximately 12:15 a.m. and 3:18 a.m. he completed approximately a dozen uneventful rides; every passenger who left a rating that night rated him five stars.

15.     At 3:19 a.m., C.Q. requested a Lyft ride from 269 W. Main Street (the "Stagger Inn") to her residence at 374 Lincoln Avenue.  The Lyft application paired her request with Mr. Wardak.

16.     Mr. Wardak arrived at the designated pickup location at 3:22 a.m.  Lyft's systems simultaneously notified C.Q.: "Your driver, Abdulqayum, is here.  Look for

5

the white Toyota Camry (B0Y058)."  At 3:22:32 a.m. Mr. Wardak messaged C.Q. through the application — "Hi, where are you?" — and at 3:27:19 a.m. he placed a call to her through the application.  She never appeared.

17.     At 3:25 a.m., Lyft sent C.Q. a second notification: "Abdulqayum is leaving soon - head over to meet them in time or you'll be charged a no-show fee." That notification exists only because C.Q. had not entered the vehicle.

18.     At 3:27 a.m., having waited the five minutes Lyft requires, Mr. Wardak cancelled the request as a no-show.  Lyft's GPS-stamped records place the cancellation at the pickup location.  Lyft charged C.Q. a $6.63 cancellation fee and credited Mr. Wardak a $2.00 wait fee.  The application notified C.Q.: "Your ride was cancelled by the driver Abdulqayum."

19.     At 3:29 a.m., Mr. Wardak accepted a different ride request; he picked up that passenger at 544 S. Upper Street at 3:32 a.m. and dropped the passenger off at 841 Red Mile Road at or before approximately 3:39 a.m.  That passenger rated him five stars.  Mr. Wardak then drove home.  A traffic camera at 603 S. Broadway — approximately 2.5 miles from 374 Lincoln Avenue — captured his vehicle at approximately 3:40 a.m., and his Lyft driver session ended at 3:44 a.m., consistent with his arrival home at 334 S. Broadway.

### B.  The Assault on C.Q. and Her Own Account of It

20.     At approximately 4:19–4:23 a.m., Lexington police were dispatched to the area of Richmond Road and Lincoln Avenue in response to a report of a sex offense, LPD Case No. 2024-180842.  C.Q. reported that she had been assaulted by a man she believed to be her Lyft driver, who she said pulled over before reaching her

6

destination, demanded $100 or sexual intercourse, climbed into the back seat on top of her, and forcibly kissed and groped her until she escaped the car.

21.    C.Q. reported that during the assault she blindly dialed a recent number on her phone — reaching her father, who listened to the assault in progress and who was present at the scene when officers arrived.

22.    In a recorded follow-up interview conducted by Detective Epley on September 24, 2024, C.Q. stated that she placed the call to her father at 3:38 a.m. and remained on the phone with him for approximately six to eight minutes — placing the assault in a window during which Lyft's records and traffic-camera footage document that Mr. Wardak was transporting a different passenger to Red Mile Road and driving home, miles from Lincoln Avenue.

23.    In the same recorded interview, C.Q. described the assailant's vehicle as a silver, small, four-door sedan similar to a "Chevy (Corolla)."  Mr. Wardak's vehicle — pictured in the Lyft application screens Detective Epley had already photographed — was a white Toyota Camry.

### C.  What Detective Epley Knew on Day One

24.    On September 22, 2024, beginning at approximately 12:41 p.m., Detective Epley personally photographed the screens of C.Q.'s phone.  The screens he captured and uploaded to the case file that day included: (a) the Lyft trip screen stating "Canceled · Sep 22, 2024, 3:27 AM" and "Your ride was cancelled by the driver Abdulqayum"; (b) the payment screen showing the $6.63 no-show cancellation fee charged to C.Q.; (c) the ride history entry "3:27 AM · Canceled by driver"; and (d)

C.Q.'s lock screen displaying the 3:22 a.m. "your driver is here" and 3:25 a.m. "leaving soon / no-show fee" notifications.

25.    Thus, within hours of the offense, the sole source of Mr. Wardak's identification — the Lyft application pairing — was known to Detective Epley to also document that the paired driver never picked C.Q. up, waited at the pickup point, cancelled as a no-show, and charged her a cancellation fee.

26.    A rideshare driver's minute-by-minute, GPS-stamped business records were available to LPD from Lyft upon service of legal process at any time.  Neither Detective Epley nor any other officer sought those records before charging Mr. Wardak.

### D.  The False and Misleading Warrant Affidavit

27.    On or about September 26–27, 2024, Detective Epley initiated charges against Mr. Wardak for Sexual Abuse in the First Degree (KRS 510.110) and Assault in the Fourth Degree (KRS 508.030), and swore a criminal complaint in support of an arrest warrant.  Complaint Warrant No. E03410004849129 was electronically signed by a Fayette District Judge on September 27, 2024, on the strength of Detective Epley's affidavit.  A copy of the Complaint Warrant, including Detective Epley's sworn complaint, is attached as Exhibit A.

28.    Detective Epley's sworn complaint stated that the offense occurred "on 9/22/2024 at 03:25."  At 3:25 a.m., a Lyft notification in Detective Epley's possession showed that Mr. Wardak was parked at the pickup location at 269 W. Main Street — approximately two miles from the scene of the assault — still waiting for C.Q.

8

29.    Detective Epley's sworn complaint stated: "I found that [C.Q.] had been picked up at 269 W. Main Street at 0319 hours, and the ride was cancelled at 0327 hours." That statement was false. C.Q. was never picked up. The very Lyft notifications and receipts Detective Epley cited as the source of his review documented that no pickup and no trip ever occurred and that C.Q. was charged a no-show fee.

30.    Detective Epley's sworn complaint further recited that after C.Q. escaped the assailant's car, "he cancelled her ride and fled the scene" — recasting the GPS-documented no-show cancellation at the pickup location as post-assault flight from Lincoln Avenue.

31.    Detective Epley's sworn complaint asserted that Mr. Wardak "matches the description provided by [C.Q.]," while omitting: (a) that C.Q. described the assailant as "possibly in his 30's" (Mr. Wardak was 26); (b) that in Detective Epley's own recorded interview three days earlier, C.Q. had described the assailant's car as a silver, small, Corolla-like sedan, not the white Toyota Camry the affidavit itself attributed to Mr. Wardak; (c) the no-show cancellation, the cancellation fee, and the 3:22/3:25 a.m. notifications; and (d) C.Q.'s account that the assault occurred during a 3:38 a.m. phone call to her father.

32.    These false statements and material omissions were made knowingly, intentionally, or with reckless disregard for the truth. Without them, the affidavit could not have established probable cause: a magistrate told the whole truth — that the application that supplied the suspect's name also recorded that he never met the

rider, was documented elsewhere at the sworn offense time, and drove a car materially different from the one described — would not have issued the warrant.

### E.  Arrest, Incarceration, and Indictment

33.    On September 30, 2024, Mr. Wardak was arrested at his home at 334 S. Broadway and booked into the Fayette County Detention Center.  He remained incarcerated for seven days, until October 7, 2024, when he was released on a $5,000 cash bond with conditions.

34.    Pretrial Services assessed Mr. Wardak as presenting the lowest possible risk on every scored measure — zero — with no criminal history of any kind.

35.    On October 22, 2024, Mr. Wardak, through counsel, produced to the police and prosecution reciprocal discovery including screenshots of his Lyft driver application documenting the 3:19–3:27 a.m. request, its "Driver canceled" disposition, the $2.00 wait fee, and his actual rides that night, together with a screen recording of a Lyft customer-support conversation in which Lyft confirmed in writing that "the ride was cancelled," that Mr. Wardak had marked the rider a no-show before cancelling, and that the $2.00 no-show wait fee had been credited to him.

36.    Notwithstanding that production, on November 13, 2024, Detective Epley appeared before the Fayette County grand jury; he is the sole witness listed on the indictment.  The grand jury returned Indictment No. 24-CR-00922 charging Mr. Wardak with Sexual Abuse in the First Degree and Assault in the Fourth Degree, and — by direct submission — Kidnapping (KRS 509.040), a Class B felony carrying up to twenty years' imprisonment.  An additional $10,000 bail was imposed on the kidnapping count.

37.    Upon information and belief, Detective Epley's grand-jury testimony repeated the false account sworn in his complaint affidavit and omitted the same exculpatory facts, and no witness disclosed to the grand jury the no-show cancellation, the vehicle discrepancy, the timeline established by C.Q.'s own phone call, or the defense's October 22 production.

### F.  The Lyft Records, the Dismissal, and the Aftermath

38.    Not until March 14, 2025 — nearly six months after Mr. Wardak's arrest and four months after the indictment — did Detective Epley serve a search warrant on Lyft, Inc. for the driver-account records that had been available all along.

39.    Lyft's certified business records corroborated Mr. Wardak's innocence in every particular: the 3:19 a.m. request; his 3:22 a.m. arrival at the pickup point; his messages and calls to the rider; the 3:27 a.m. no-show cancellation at the pickup location; the 3:29–3:39 a.m. ride with a different passenger; and the end of his driving session at 3:44 a.m.

40.    The prosecution nevertheless continued for four more months.  On or about July 18, 2025, the Commonwealth moved to dismiss the indictment without prejudice, acknowledging that Mr. Wardak had "plausible defenses."  Mr. Wardak, through counsel, objected and asked that the dismissal be with prejudice in light of the exculpatory record.  On July 21, 2025, the Fayette Circuit Court sustained the Commonwealth's motion and dismissed the indictment.  The prosecution thereby terminated without a conviction and in Mr. Wardak's favor.  The dismissal was not the product of any plea agreement, compromise, diversion, settlement, or act of leniency sought by Mr. Wardak — who to the contrary asked the court to make the

11

dismissal with prejudice — but followed the Commonwealth's own acknowledgment of the exculpatory record. No charge has been refiled. A copy of the Order of Dismissal is attached as Exhibit B. This action is commenced within one year of that favorable termination.

41. As a direct and proximate result of Defendants' conduct, Mr. Wardak suffered and continues to suffer damages including: seven days of incarceration; ten months under felony indictment with attendant bond, travel, and no-contact conditions; the posting of a $5,000 cash bond and exposure to $10,000 additional bail; criminal-defense attorney's fees and costs; lost income and employment opportunity, including loss of his ability to drive for rideshare platforms; loss of his ability to ride on rideshare platforms as a passenger; profound reputational injury from public accusation of sexual offenses and kidnapping; humiliation, anxiety, and severe emotional distress; and — because Mr. Wardak is a refugee whose lawful status and protection from removal to Afghanistan depend on his record — a prolonged and terrifying threat to his immigration status and personal safety including potential death.

## V. CAUSES OF ACTION

### COUNT I

**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments**

**Malicious Prosecution / Unlawful Pretrial Seizure**
(Against Defendant Epley and Defendants Does 1–10)

42. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

43. Defendant Epley, and Doe Defendants who participated in the charging decision, influenced and participated in the decision to initiate and to continue the criminal prosecution of Mr. Wardak.

44. There was no probable cause for the initiation or continuation of the prosecution, or for any of the individual charges, including the directly-submitted kidnapping count. Any presumption of probable cause arising from the grand jury's indictment is unavailable to Defendants because Defendant Epley knowingly or recklessly made false statements and withheld material exculpatory evidence; those statements and omissions were made prior to the indictment; they were non-testimonial in nature, consisting of, among other things, his sworn complaint affidavit and the investigative file he created and maintained; and they laid the foundation for the charges and for the indictment that followed.

45. As a consequence of the legal proceedings so procured, Mr. Wardak suffered deprivations of liberty apart from the initial arrest, including seven days' detention, cash bond, and ten months of felony release conditions.

46. The criminal proceeding was resolved in Mr. Wardak's favor on July 21, 2025, when it was dismissed and ended without a conviction.

47. Defendants' conduct violated Mr. Wardak's clearly established rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, and Defendants are liable to him for compensatory and punitive damages.

## COUNT II

13

**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments**

**Judicial Deception: Procurement of an Arrest Warrant by Material**

**False Statements and Omissions**

(Against Defendant Epley)

48.    Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

49.    Defendant Epley knowingly, intentionally, or with reckless disregard for the truth made false statements in, and omitted material exculpatory facts from, his September 2024 warrant affidavit, as set forth in Section IV.D above.

50.    The false statements and omissions were material to the finding of probable cause.  With the false statements excised and the omitted facts included, the affidavit fails to establish probable cause.

51.    Mr. Wardak was arrested, detained, and prosecuted pursuant to the warrant so procured, in violation of his clearly established rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, and Defendant Epley is liable to him for compensatory and punitive damages.

52.    Because this claim challenges the validity of the legal process by which Mr. Wardak was detained and prosecuted, it did not accrue until the criminal proceedings terminated in his favor on July 21, 2025.

**COUNT III**

**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments**

**Continuation of Detention and Prosecution After Probable Cause Dissolved**

(Against Defendant Epley and Defendants Does 1–10)

14

53.   Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

54.   Whatever arguable basis existed at any moment for suspecting Mr. Wardak was extinguished — at the latest — by the defense's October 22, 2024 production of the driver-side Lyft records, and again by Lyft's certified March 14, 2025 production.  Defendants nevertheless caused the prosecution, and the liberty restraints it imposed, to continue until July 21, 2025.

55.   Defendants' continuation of the seizure and prosecution of Mr. Wardak after probable cause had dissolved violated his clearly established rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, and Defendants are liable to him for compensatory and punitive damages.

## COUNT IV

### 42 U.S.C. § 1983 — Failure to Intervene
(Against Defendants Does 1–10)

56.   Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

57.   Doe Defendants observed or had reason to know of the constitutional violations alleged herein — including the submission of a false and misleading warrant affidavit and the continuation of a prosecution known to lack probable cause — had a realistic opportunity to intervene to prevent or end them, and failed to do so, in violation of Mr. Wardak's clearly established constitutional rights.

## COUNT V

15

**42 U.S.C. § 1983 — Supervisory Liability**

(Against Defendants Does 1–10)

58.    Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

59.    Doe Defendants with supervisory authority over Defendant Epley and over LPD's investigation reviewed, authorized, approved, or ratified the warrant application, the charging decision, and/or the continuation of the prosecution, at minimum implicitly authorizing and knowingly acquiescing in the unconstitutional conduct of their subordinates, in violation of Mr. Wardak's clearly established constitutional rights.

## COUNT VI

**42 U.S.C. § 1983 — Municipal Liability (Monell)**

(Against Defendant LFUCG)

60.    Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

61.    The violations of Mr. Wardak's rights were proximately caused by policies, customs, and practices of LFUCG, including upon information and belief: (a) the failure to train and supervise officers and detectives in the corroboration of suspect identifications derived from rideshare and other digital-platform pairings, including the elementary step of obtaining the platform's records before charging; (b) the failure to train and supervise officers and detectives in the handling and disclosure of exculpatory evidence, including the duty to reassess probable cause when exculpatory evidence emerges after charging; (c) a custom or practice of

16

charging first and verifying later in sex-offense investigations; and (d) the absence of any meaningful supervisory review of warrant affidavits against the evidence actually in the case file.

62. The need for such training and supervision was obvious, and the inadequacy so likely to result in the violation of constitutional rights, that LFUCG's policymakers were deliberately indifferent to the need. LFUCG further ratified the unconstitutional conduct by maintaining and defending the prosecution after the exculpatory record was complete and by failing to discipline or retrain any officer involved.

63. LFUCG is liable to Mr. Wardak for the resulting damages.

## COUNT VII

### Malicious Prosecution Under Kentucky Law
(Against Defendant Epley and Defendants Does 1–10)

64. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

65. Defendant Epley and Doe Defendants instituted, procured, and/or continued criminal proceedings against Mr. Wardak; they acted without probable cause; they acted with malice, which may be and is inferred from, among other things, their reckless disregard of the exculpatory evidence in their own possession; the proceedings terminated in Mr. Wardak's favor on July 21, 2025; and Mr. Wardak suffered damages as set forth herein.

66. The individual Defendants' conduct was undertaken in bad faith and in violation of clearly established rights of which a reasonable officer would have known,

17

and is therefore unprotected by qualified official immunity. Defendants are liable for compensatory and punitive damages.

## COUNT VIII

### Abuse of Process Under Kentucky Law

(Against Defendant Epley and Defendants Does 1–10)

67.    Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

68.    In the alternative and in addition, the individual Defendants employed legal process against Mr. Wardak for an ulterior purpose — to sustain and justify a charging decision they knew or recklessly disregarded was unsupported — and committed willful acts in the use of that process not proper in the regular conduct of the proceeding, proximately causing Mr. Wardak damages as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Abdulqayum Wardak respectfully demands judgment against the Defendants, jointly and severally, as follows:

(a)    Compensatory damages in an amount to be determined by the jury, including damages for loss of liberty, physical and emotional injury, humiliation, reputational harm, lost income and earning capacity, and criminal-defense attorney's fees and expenses;

(b)    Punitive damages against the individual Defendants;

(c)    Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

(d)    Pre-judgment and post-judgment interest as permitted by law;

(e)     Trial by jury on all issues so triable; and

(f)     All other relief to which Plaintiff may appear entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Jonas Bastien
JONAS BASTIEN (KBA # 99495)
Bastien Law, PLLC
163 East Main Street, Suite 403
Lexington, Kentucky 40507
T: 859-519-4171
F: 859-201-1004
E: jonas@bastienlawfirm.com


/s/ Erik S. Young
Erik S. Young, PLLC
169 E. Reynolds Road, Suite 203A
Lexington, Kentucky 40517
T: 859-699-3791
E: erik@esylegal.com

*Counsel for Plaintiff Abdulqayum Wardak*